IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| LEQUITA DENNARD, JOHN GULO, TERRANCE LAVELA, KATHRYN A. SEDLACEK, HENRY D. SCHMOLL, and PHILIP A. KRAMER, <br><br> Plaintiffs, <br><br> v. <br><br> AEGON USA LLC, TRANSAMERICA FINANCIAL LIFE INSURANCE COMPANY, TRANSAMERICA RETIREMENT SOLUTIONS CORPORATION, KIRK BUESE, RALPH ARNOLD, KEN KLINGER, MARY TAIBER, DIANE MEINERS, and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No.  1:15-cv-00030-EJM <br><br> **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNT II OF THE SECOND AMENDED COMPLAINT** <br><br><br> Judge:  Hon. Edward J. McManus <br> Magistrate:     Hon. Jon S. Scoles <br><br><br> ORAL ARGUMENT REQUESTED |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

STANDARD OF REVIEW ...................................................................................... 2

ARGUMENT ........................................................................................................... 2

A.  The AEGON Plan's Investments in Affiliated Funds Are Permitted Under
    ERISA's Well-Established Prohibited Transaction Exemptions. ..................................... 3

    1.  The Structure of the TFLIC Separate Accounts Allowed the Plan to Offer
        Those Investments at the Lowest Expense Ratios Offered to Any Investor.......... 4

    2.  Investments in the TAM Funds are Permitted Under a Longstanding DOL
        PTE. ........................................................................................................... 5

    3.  The Plan's Investments in the TFLIC Pooled Separate Accounts Are Also
        Permissible Under Longstanding Statutory Exemptions. ...................................... 8

    4.  The Plan Paid Only Reasonable Compensation for the MFTC Collective
        Trusts......................................................................................................... 10

    5.  The Plan Paid Only Adequate Consideration for its Stable Fund
        Investment................................................................................................... 11

B.  Plaintiffs Had Actual Knowledge That Their Investments Were Affiliated With
    AEGON Long Before February 6, 2012, and So Their Prohibited Transaction
    Claims are Barred by ERISA's Limitations Period. ....................................................... 14

C.  ERISA's Six-Year Statute of Repose Precludes All ERISA § 406(b)(1) Claims for
    Which Plaintiffs Have Standing, Because the Funds at Issue Were Added to the
    Plan More Than Six Years Before the Commencement of This Suit. ............................ 17

CONCLUSION...................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ................................................................................................ 2

*Bodine v. Commissioner of Internal Revenue,*
103 F.2d 982 (3d Cir. 1939) ................................................................................ 12

*Braden v. Wal-Mart Stores, Inc.,*
588 F.3d 585 (8th Cir. 2009) ................................................................................ 1

*Brock v. Robbins,*
830 F.2d 640 (7th Cir. 1987) ................................................................................ 8

*Brown v. Am. Life Holdings, Inc.,*
190 F.3d 856 (8th Cir. 1999) .............................................................................. 14

*Brown v. Owens Corning Inv. Review Comm.,*
622 F.3d 564 (6th Cir. 2010) .............................................................................. 15

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ............................................................................................... 2

*David v. Alphin,*
704 F.3d 327 (4th Cir. 2013) .............................................................................. 17

*Dupree v. Prudential Ins. Co. of America,*
No. 99-8337, 2007 U.S. Dist. LEXIS 57857 (S.D. Fla. Aug. 7, 2007) ................... 13

*Figas v. Wells Fargo & Co.,*
No. 08-4546, 2010 U.S. Dist. LEXIS 79965 (D. Minn. Apr. 6, 2010) ................... 15

*Gipson v. Wells Fargo & Co.,*
No. 08-4546, 2009 U.S. Dist. LEXIS 20740 (D. Minn. Mar. 13, 2009) ................. 6

*Gluck v. Unisys Corp.,*
960 F.2d 1168 (3d Cir. 1992) .............................................................................. 15

*I.B.E.W. Local 1448 Health & Welfare Fund v. Thorndyke Int'l, Inc.,*
No. 97 CV 5718, 1998 U.S. Dist. LEXIS 17193 (E.D. Pa. Oct. 26, 1998) .............. 8

*Kouba v. Joyce,*
No. 83 C 451, 1987 U.S. Dist. LEXIS 12334 (N.D. Ill. Dec. 31, 1987) ................. 8

*Krueger v. Ameriprise Fin., Inc.,*
No. 11-cv-02781, 2014 U.S. Dist. LEXIS 36435 (D. Minn. Mar. 20, 2014) ............ 14

Case 1:15-cv-00030-EJM   Document 79-1   Filed 11/23/15   Page 3 of 23

**Page(s)**

*Manne v. Commissioner of Internal Revenue,*
    155 F.2d 304 (8th Cir. 1946) ................................................................. 12

*Phillips v. Alaska Hotel and Restaurant Employees Pension Fund,*
    944 F.2d 509 (9th Cir. 1991) ................................................................ 16

*Radford v. Gen. Dynamics Corp.,*
    151 F.3d 396 (5th Cir. 1998) ................................................................ 17

*Shirk v. Fifth Third Bancorp,*
    No. 05-cv-049, 2009 U.S. Dist. LEXIS 90775 (S.D. Ohio Sept. 30, 2009) ............................ 15

*Tibble v. Edison Int'l,*
    __U.S. __, 135 S. Ct. 1823 (2015) ........................................................ 17, 18

*Tibble v. Edison Int'l,*
    711 F.3d 1061 (9th Cir. 2013) .............................................................. 17

*Wright v. Or. Metallurgical Corp.,*
    360 F.3d 1090 (9th Cir. 2004) .............................................................. 17

*Wsol v. Fiduciary Mgmt. Assocs.,*
    266 F.3d 654 (7th Cir. 2001) ................................................................ 8

**Statutes**

29 U.S.C. § 1002 ................................................................................. 13

29 U.S.C. § 1106 ................................................................. 3, 14, 16, 18

29 U.S.C. § 1108 ..................................................................... 3, 8, 11

29 U.S.C. § 1113 ..................................................................... 1, 14–18

**Rules**

Fed. R. Civ. P. 1 ................................................................................ 2

Fed. R. Civ. P. 56 ............................................................................ 2, 18

**Other Authorities**

42 Fed. Reg. 18734 (Apr. 8, 1977) ............................................................ 5, 6

56 Fed. Reg. 10724 (Mar. 13, 1991) ............................................................. 3

Black's Law Dictionary (10th ed. 2014) ......................................................... 13

## INTRODUCTION

Count II of the Second Amended Complaint ("SAC"), plaintiffs' prohibited transaction claim, is based on AEGON's offering of affiliated investments to its in-house plan (the "Plan"). This common industry practice is expressly permitted under ERISA statutory and regulatory exemptions—ERISA does not force financial services companies to enlist their direct competitors to provide services to their own in-house plans, provided certain straightforward conditions are met. In particular, express prohibited transaction exemptions ("PTEs") allow a financial services company to offer affiliated mutual funds to its in-house plan when the plan invests on terms no less favorable than those provided to other shareholders, and to offer other insurance and investment products when they are provided for no more than reasonable or adequate consideration. Here, there can be no material dispute of fact that the affiliated investment funds were offered to the AEGON Plan on the best terms available. In fact, the affiliated funds were offered to the Plan at a lower cost than most outside investors voluntarily paid when purchasing the same underlying investments. Under these statutory and Department of Labor ("DOL")-promulgated PTEs, defendants are thus entitled to judgment in their favor on plaintiffs' prohibited transaction claim.[1]

Additionally, plaintiffs' prohibited transaction claim is barred by 29 U.S.C. § 1113, which provides both a six-year statute of repose from the date of the purportedly prohibited transaction and a three-year statute of limitations from plaintiffs' actual knowledge of the alleged transaction. All but one of the affiliated investment options challenged in the SAC have been included in the Plan's investment lineup for more than six years, and plaintiffs lack standing to contest the remaining option (the Real Estate Fund), as no named plaintiff invested in that fund. Moreover, it is indisputable that plaintiffs had actual knowledge that each of the challenged

---

[1] The Second Amended Complaint does not plead facts contrary to these PTEs—but, because the Eighth Circuit has held that PTEs are affirmative defenses, *see Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 600-01 (8th Cir. 2009), they are not addressed in defendants' concurrently filed motion for judgment on the pleadings.

investment options was offered by AEGON affiliates, and that those affiliates were collecting fees in connection with those options. Disclosures of the affiliated status of the challenged funds go back at least a decade, and in any event long before February 6, 2012, or three years prior to the filing of the initial complaint in this action. Plaintiffs' prohibited transaction claim is thus also barred by ERISA's three-year statute of limitations.

For these reasons, explained in greater detail below, defendants are entitled to summary judgment in their favor on plaintiffs' prohibited transaction claim.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## ARGUMENT[2]

Plaintiffs' prohibited transactions claim suffers from numerous fatal defects. Foremost, it ignores that defendants' use of affiliated products as core options for participants in the AEGON Plan is permitted under multiple exemptions from ERISA's prohibited transaction provisions, as all of the affiliated products offered to the Plan were made available to participants not only for no more than adequate consideration (or reasonable compensation), but at the lowest express or implied fees available to any investor. Further, there can also be no dispute of material fact that plaintiffs had actual knowledge of the allegedly prohibited transactions more than three years

---

[2] All citations of numbered exhibits, unless otherwise noted, refer to the exhibits included in the concurrently filed Appendix In Support of Defendants' Motion for Summary Judgment on Count II of the Second Amended Complaint.

before filing the complaint, and so their claim is barred by ERISA's three-year statute of limitations. Indeed, as the challenged investments were added to the platform more than six years prior to the filing of their initial complaint, plaintiffs' prohibited transaction claim is also barred by ERISA's six-year statute of repose.

### A. The AEGON Plan's Investments in Affiliated Funds Are Permitted Under ERISA's Well-Established Prohibited Transaction Exemptions.

ERISA broadly defines "prohibited transactions," but also provides a wide range of exemptions—among which are exemptions allowing a financial services company to offer affiliated funds to its in-house 401(k) plan, and to collect fees from those funds.[3] Banks, insurers, mutual fund providers and other financial services companies routinely avail themselves of these exceptions when creating and administering in-house retirement plans. Offering affiliated investment products to the employees responsible for creating, managing and marketing such products to the public, as core options in their own 401(k) plan, is a broadly accepted practice for good reason: companies know their own products and have an advantage in securing those products on the best possible terms and at the lowest price. ERISA explicitly permits such arrangements, as the Department of Labor recognizes that it would be "contrary to normal business practice for a company whose business is financial management to seek financial management services from a competitor." Notice of Proposed Rulemaking, Participant Directed Individual Account Plans, 56 Fed. Reg. 10724 (Mar. 13, 1991).

There are three types of investment funds at issue in this case: (1) pooled separate accounts; (2) collective trusts; and (3) a stable value fund. All three types are covered by PTEs.

---

[3] Under Section 406 of ERISA, 29 U.S.C. § 1106, a fiduciary is prohibited from engaging in most transactions for its own benefit, 29 U.S.C. § 1106(b), or with a "party in interest," 29 U.S.C. § 1106(a), which is also broadly defined, and generally includes corporate affiliates. Section 408 of the statute, 29 U.S.C. § 1108, however, enumerates a number of exemptions, while also providing that "[t]he Secretary [of Labor] shall establish an exemption procedure," pursuant to which, "he may grant a conditional or unconditional exemption of any fiduciary or transaction, or class of fiduciaries or transactions, from all or part of the restrictions" of § 1106. 29 U.S.C. § 1108(a).

The majority of the affiliated options offered to Plan participants are of the first type—pooled separate accounts offered by TFLIC, which invest, in turn, in funds advised by TAM. The pooled separate accounts are simplified investment vehicles, with no SEC registration requirements, that allow TFLIC to offer the TAM funds to the Plan without any additional cost beyond the TAM funds' expense ratios. (Ex. 40, Declaration of Jeff Jakubasz, at ¶ 5.) The TAM funds are registered investments companies (RICs), similar to mutual funds, and in most cases the same strategies have also been offered to external investors through publicly traded mutual funds, but at a higher cost than the Plan paid to invest via TFLIC's pooled separate accounts. (Ex. 38, Declaration of Eddie Arias, at ¶ 7.) Most of the allegations in the SAC involve these TFLIC funds. In addition to these TFLIC separate accounts, the SAC mentions two affiliated collective trusts—the Stock Index Fund and the Real Estate Fund—and an affiliated stable value fund—the Stable Fund. Although the allegations in the SAC regarding these funds are sparse, these other affiliated funds are also covered by well-established PTEs.

      1.    *The Structure of the TFLIC Separate Accounts Allowed the Plan to Offer Those Investments at the Lowest Expense Ratios Offered to Any Investor.*

All the affiliated investments selected by the Plan are structured to offer participants the lowest fees extended to any investor in these products. For the TFLIC separate accounts that comprised the bulk of the affiliated investments,[4] the Plan's ultimate investment was in TAM-advised registered investment companies ("RICs"). The TAM-advised RICs are registered and regulated under the Investment Company Act of 1940 ("'40 Act"), which requires the funds to file—and allows participants to access—audited financial statements and other SEC documents for the funds. (*See* Ex. 15, TFLIC 2013 Annual Report, at 557.) These RICs are not registered for public offering under the Securities Act of 1933 ("'33 Act"), however—in other words, they

---

[4] Currently, these include the High Quality Bond, Core Bond, High Yield Bond, Large Value, Large Core, Large Growth, Mid Value, Small Core, and International Equity funds. Historically, they also included the Growth Fund—although, again, plaintiffs make no allegations regarding that fund in the SAC.

4

are not, and cannot be, sold directly to the public as listed mutual funds. This, in part, makes the RICs less expensive than even the cheapest, institutional class shares ("I-shares") available for similar TAM mutual funds registered under the '33 Act, including to external retirement plans.[5]

Because the TAM RICs are not offered publicly, the AEGON Plan does not purchase them directly, but instead invests in the RICs through separate accounts maintained by another affiliate, TFLIC. Separate accounts are pooled investment vehicles that allow multiple investors, including those outside the AEGON Plan, to invest collectively without the registration requirements and other regulatory restrictions of mutual funds. (Ex. 40 at ¶ 5.)

### 2. *Investments in the TAM Funds are Permitted Under a Longstanding DOL PTE.*

An investment company is permitted to offer affiliated mutual funds to its in-house plan under PTE 77-3, 42 Fed. Reg. 18734 (Apr. 8, 1977), which expressly permits retirement plans to invest in '40-Act registered, affiliated funds provided there are no commissions or other extraneous fees, and the investments are offered to the plan on the best available terms. The DOL created this exception, just three years after the passage of ERISA, to allow plans to invest in products created and sold by the plans' sponsors or affiliates. There can be no factual dispute that these conditions are met with respect to the TAM funds.

In detail, PTE 77-3 permits a plan to purchase "shares of an open-end investment company registered under the Investment Company Act of 1940, by an employee benefit plan covering only employees of such investment company, employees of the investment adviser or principal underwriter for such investment company, or employees of any affiliated person . . . of such investment adviser or principal underwriter . . . ." 42 Fed. Reg. at 18734-35. The plan also must not:

---

[5] The I-shares, as their name implies, are themselves sold only on a limited basis to certain qualified retirement fund investors. (*See, e.g.*, Ex. 28, Transamerica Partners Institutional Large Value Summary Prospectus, at 1826.)

1. Pay any fees to the investment adviser except via the investment company's payment of its standard advisory and other fees;

2. Pay a redemption fee to any party other than the investment company itself;

3. Pay a sales commission; and

4. Have dealings with the investment company on terms that are less favorable than between the investment company and any other shareholder.

PTE 77-3, 42 Fed. Reg. at 18735; *see also Gipson v. Wells Fargo & Co.*, No. 08-4546, 2009 U.S. Dist. LEXIS 20740, at *10 (D. Minn. Mar. 13, 2009).

The TAM funds in which the TFLIC separate accounts invest meet all of these conditions. "The Portfolios are registered under the Investment Company Act of 1940, as amended, as open-ended, diversified, management investment companies." (Ex. 15 at 557.) TAM, an affiliate of AEGON and TFLIC, serves as the investment advisor to the portfolios (*id.*), and there is no dispute that the Plan is offered only to employees of AEGON affiliates. (Ex. 6, 2014 Plan Document, at 304.) Nor does the Plan pay a sales commission, redemption fee, or any fee beyond the standard advisory fee for the RICs. (Ex. 40 at ¶ 7; *see also* Ex. 20, TAM Investment Advisory Agreement, at 1709–17; Exs. 14–15, TFLIC Annual Reports for 2011 and 2013; Exs. 16–18, TAM Annual Reports for 2012–2014.) The TAM funds are sold to TFLIC (through the pooled separate accounts) on the most favorable terms available to any investor. (Ex. 38 at ¶ 6.)

The SAC alleges nothing to contradict the application of PTE 77-3, instead alleging simply that defendants "engage[d] in prohibited transactions each time they withdrew management fees from Proprietary Funds." (SAC at ¶ 71.) But withdrawing standard management fees from an affiliated RIC is precisely the conduct permitted under PTE 77-3, which expressly allows "the payment of investment advisory fees by the investment company under the terms of its investment advisory agreement. . . ." Plaintiffs cannot offer a material, disputed fact suggesting that PTE 77-3 does not apply.

As an illustration confirming that the TAM funds are covered by PTE 77-3, consider the Large Value Fund.[6] (SAC at ¶ 38.) TFLIC paid nothing more than the 0.45% investment advisory fee under the investment advisory agreement for its investment in the TAM Large Value fund, as required by the first condition of PTE 77-3. (Ex. 20 at 1717.) TFLIC paid no other fees to TAM in connection with its investment in the fund; specifically, there were no redemption fees or commissions, in accordance with the second and third conditions of PTE 77-3. (*Id.*; Ex. 15 at 690; Ex. 38 at ¶ 5.) Nor did TAM offer the Large Value fund to any other investor on better terms. (Ex. 38 at ¶¶ 3−5.) To the contrary, the 0.45% fee that TFLIC paid to TAM for the Large Value fund was considerably lower than the 0.75% total expense ratio paid by shareholders of the institutional class shares of TAM mutual funds that invest in identically-managed and sub-advised RICs. (Ex. 28 at 1820; *compare* Ex. 20 at 1717 (showing TFLIC paid TAM 0.55% fee on High Yield Bond fund) *with* Ex. 27, Transamerica Partners Institutional High Yield Bond Summary Prospectus, at 1809 (0.85% total expense ratio on institutional class shares).)

Prior to the filing of the First Amended Complaint ("FAC") in this action, defendants voluntarily provided plaintiffs with disclosures on the structure of and fees associated with the Plan's affiliated funds. Even armed with this information, plaintiffs were unable to make any allegations that would negate the application of PTE 77-3. There is no genuine dispute of material fact that TFLIC's separate account investments in the TAM funds are on terms no less favorable than those offered to any other shareholders in the TAM funds, *see* PTE 77-3(d), affiliated or otherwise, and no dispute that the investments did not carry extraneous fees or otherwise violate the conditions of PTE 77-3.

---

[6] This fund was formerly known as the Value & Income Fund. (*See* Ex. 24, First Quarter 2009 Fund Fact Sheets, at 1772.)

### 3. The Plan's Investments in the TFLIC Pooled Separate Accounts Are Also Permissible Under Longstanding Statutory Exemptions.

That the Plan invested in the TAM funds through TFLIC separate accounts does not create any problems under ERISA: the Plan's investments in the TFLIC pooled separate accounts are themselves permitted by the statutory PTEs enumerated in ERISA § 408, 29 U.S.C. § 1108. Among the PTEs in § 1108 are provisions allowing transactions between a plan and "a common or collective trust fund or pooled investment fund" of a bank or trust company or "a pooled investment fund" of an insurance company, provided such investments are permitted by the Plan Document and only "reasonable compensation" is paid. 29 U.S.C. § 1108(b)(8). Investments in the TFLIC pooled accounts are permitted by the Plan Document. (Ex. 2 at 91, § 7.1.) TFLIC is also an insurance company within the meaning of § 1108(b)(8). (Ex. 15 at 557.)

The central question, then, is reasonable compensation. While ERISA § 408(b)(8) permits a Plan to pay "reasonable compensation" for investments in affiliated pooled accounts and collective trusts, it does not define that term. Generally, however, compensation is reasonable when it falls within the range of charges prevailing in the relevant industry. *See, e.g.*, *Wsol v. Fiduciary Mgmt. Assocs.*, 266 F.3d 654, 658 (7th Cir. 2001) (affirming the district court's finding that an industry standard 6 cents per share per trade commission was reasonable compensation for broker services); *Brock v. Robbins*, 830 F.2d 640, 644–46 (7th Cir. 1987) (affirming district court's finding that fees charged by a service provider were reasonable because they were lower than the industry standard); *Kouba v. Joyce*, No. 83 C 451, 1987 U.S. Dist. LEXIS 12334, at *27–28 (N.D. Ill. Dec. 31, 1987) (comparing compensation of service provider to the standard industry rate); *I.B.E.W. Local 1448 Health & Welfare Fund v. Thorndyke Int'l, Inc.*, No. 97 CV 5718, 1998 U.S. Dist. LEXIS 17193, at *12 (E.D. Pa. Oct. 26, 1998) (finding no breach of fiduciary duty where plaintiff did not offer evidence that a 7% or 8% commission was contrary to business practice or otherwise unreasonable).

Again, contrary to plaintiffs' allegations, the structure of the affiliated investments limits the fees charged, as the fees of the TFLIC separate accounts are the cheapest means of investing in the underlying TAM RICs that is available to any investors on AEGON's platform. (*See* Ex. 40 at ¶ 6.) Further, a broad range of other investors participate in the same TAM RICs offered to the Plan via the TFLIC separate accounts—at fees higher than those paid by the Plan. (Ex. 38 at ¶ 8.) In addition, the Plan's holdings in each TAM fund, via TFLIC, are only a small fraction of the account's holdings. (Ex. 15 at 688 (showing the percentage of the assets of each TAM fund held by TFLIC separate accounts); *see, e.g.*, Exs. 29–31, 2013 Forms 5500 for High Yield Bond, Core Bond, and Large Value Funds (showing investors in the TFLIC funds beyond the Plan).) Billions of dollars have been invested in many of the same TAM RICs through institutional and retail class mutual funds, and the expense ratios charged to these investors are uniformly higher than those charged to the Plan through the pooled separate accounts. (Ex. 38 at ¶ 7; Ex. 40 at ¶ 6; Ex. 19, TAM Funds March 1, 2015 Prospectus.) These considerations show that the Plan's fees for the TFLIC separate accounts are reasonable as a matter of law. In short, the Plan paid the lowest fees offered to any retirement plan investors—and most investors paid more.[7]

Nor can plaintiffs manufacture a material dispute of fact by arguing that the TFLIC separate account structure added costs beyond those associated with the investments in the underlying TAM funds. In response to plaintiffs' misleading allegations of fee-layering in the initial complaint, defendants voluntarily disclosed to plaintiffs voluminous documents showing that TFLIC's charges barely covered the costs of the Plan's indirect investment in the TAM funds during the relevant period. Indeed, as shown in the table below (constructed from disclosures already provided to plaintiffs), TFLIC **subsidized** the Plan's investments in the TAM funds in 2013 (*see* Ex. 15 at 544–46, 556, 673–76). The TFLIC separate accounts were simply

---

[7] Among the materials defendants provided plaintiffs through early voluntary disclosures were documents also showing that the Plan's fees are in line with a Brightscope survey plaintiffs had put forth as a benchmark for assessing reasonable fees in their initial complaint. (Compl. (Dkt. 1) at ¶ 32.)

the cheapest available means of investing in the underlying TAM funds offered to any investor.
(Ex. 38 at ¶¶ 3–8; Ex. 40 at ¶ 6.)

| Table 1—2013 Fees on TFLIC Separate Accounts | | | | |
|---|---|---|---|---|
| **Fund Name** | **Portfolio Expenses** | **Total Fee** | **TFLIC Net Fees (Difference, in Basis Points)** | **TFLIC Net Fees (Difference, in Dollars)** |
| High Quality Bond | 0.39% | 0.40% | 0.01% | $4,713.00 |
| Core Bond | 0.39% | 0.40% | 0.01% | $6,359.00 |
| High Yield Bond | 0.59% | 0.50% | -0.09% | -$31,042.00 |
| Large Value | 0.48% | 0.50% | 0.02% | $18,486.00 |
| Large Core | 0.64% | 0.65% | 0.01% | $5,609.00 |
| Large Growth | 0.65% | 0.65% | 0.00% | -$681.00 |
| Mid Value | 0.70% | 0.70% | 0.00% | -$246.00 |
| Small Core | 0.84% | 0.85% | 0.01% | $3,739.00 |
| International Equity | 0.85% | 0.80% | -0.05% | -$32,649.00 |
| **Total** | | | | -$25,712.00 |

Plaintiffs have had these materials for months, and amended their complaint to remove the prior allegations about fee layering after learning that TFLIC was not earning an extra layer of fees from making available the TAM funds to the Plan through its pooled separate accounts. The SAC offers nothing to counter this evidence that only reasonable fees were paid for the TFLIC separate accounts.[8]

    4.   *The Plan Paid Only Reasonable Compensation for the MFTC Collective Trusts.*

The SAC does not even allege that the fees are unreasonable for the affiliated, non-TAM investments—the Stable Fund, Stock Index Fund, and Real Estate Fund—beyond including

---

[8] The Horizon funds—in which no plaintiffs are alleged to have invested (SAC at ¶¶ 13–18) and which have not been offered in the Plan since September 2012—invested in a mix of these separate accounts, according to five different risk and investment horizon profiles. These funds also charged only reasonable compensation, and so also qualify for the § 408(b)(8) exemption. Specifically, the Horizon funds charged fees representing the "annualized aggregate asset charges based on the Fund's investment in underlying funds during the last fiscal year." (Ex. 25, Fourth Quarter 2011 Fund Fact Sheets.) A prohibited transaction claim with respect to the Horizon funds is also barred by ERISA's statute of limitations. *See infra* at Section B.

those funds on the list of affiliated investments.  Nor are the funds included in Table 2 of the SAC (SAC at ¶ 40) which lays out plaintiffs' theory by which the fees associated with the affiliated investments are supposedly excessive.  In any case, the Stock Index Fund and Real Estate Fund are also covered by the PTE enumerated in 29 U.S.C. § 1108(b)(8), and so they do not constitute prohibited transactions so long as only reasonable compensation is paid for them.[9]

The two collective trust funds, the Stock Index Fund and the Real Estate Fund, qualify for the § 1108(b)(8)  exemption because they are "a common or collective trust fund " with MFTC, a bank chartered under Iowa law, serving as trustee.  (Ex. 22, MFTC Iowa Schedule RI - Income Statement.)  They are also permitted by the Plan Document.  (Ex. 2 at 91, § 7.1.)  And only reasonable compensation was paid for these funds, as there is no genuine dispute of fact that either fund was offered to any other investors on better terms than those offered to the Plan—and the Stock Index fund, in particular, had many other investors.  (*See* Ex. 40 at ¶ 8.)

Plaintiffs' allegations do nothing to contradict the conclusion that these funds qualify under § 408(b)(8).  There is no dispute that plaintiffs were not invested in the Real Estate Fund, (SAC at ¶¶ 13–18) and the SAC offers no specific allegations regarding that fund.  While the SAC does allege that the disclosures related to the Stock Index Fund's portfolio were inadequate (SAC at ¶¶ 42–43) those allegations have no bearing on whether the Stock Index fund qualifies for the PTE enumerated in § 1108(b)(8).  As there is also no dispute that the collective trusts were available to the Plan on the best available terms, plaintiffs cannot maintain their prohibited transaction claim with respect to these funds.

     *5.   The Plan Paid Only Adequate Consideration for its Stable Fund Investment.*

Again, the allegations in the SAC regarding the Stable Fund are sparse, and the fund is omitted from plaintiffs' core excessive fee allegations.  (SAC at ¶ 40.)  Nonetheless, the Stable Fund is also exempt from plaintiffs' prohibited transaction theories as a result of a separate

---

[9] The Stable Fund is covered by 29 U.S.C. § 1108(b)(5).  *See infra* at Section A.5.

statutory exemption, ERISA § 408(b)(5), 29 U.S.C. § 1108(b)(5), which allows the purchase of affiliated insurance products provided only "adequate consideration" is paid.

The Stable Fund is a general account product, offered to the Plan through the group annuity contract with TFLIC. TFLIC guarantees that participants will receive the return of their principal, plus a fixed crediting rate that is set periodically in advance. (Ex. 41, Declaration of Gerald Katz, at ¶ 4.) Unlike with many other AEGON general account stable value investors, TFLIC does not levy asset charges or other explicit fees for the Plan's Stable Fund investment. The only "fees" are implied by the spread between the earnings TFLIC achieves on the pertinent general account assets and the crediting rates that are periodically declared in advance. In the case of the Plan's Stable Fund investment, however, TFLIC sets crediting rates that are targeted to cover TFLIC's expenses associated with the investment, and nothing more—there is no separate "spread" targeted as a profit component to TFLIC. (Ex. 41 at ¶ 7.) In addition, the Plan's Stable Fund includes a uniquely generous feature allowing termination and withdrawal over a brief, one-year period; the TFLIC general account stable value products sold to external plan investors required longer guarantees, most commonly five years. (Ex. 41 at ¶ 5.) Yet despite the shorter guarantee period, at least since January 1, 2009, the Stable Fund available to the Plan has enjoyed higher declared crediting rates than the standard five-year TFLIC general account stable value products sold to external clients. (Ex. 41 at ¶ 6.)

These facts establish that the Plan's investment in the Stable Fund qualifies for the prohibited transaction exemption enumerated in ERISA § 408(b)(5).[10] External clients that have

---

[10] ERISA § 408(b)(5) exempts from ERISA's prohibitions "Any contract for life insurance, health insurance, or annuities with one or more insurers which are qualified to do business in a State, if the plan pays no more than adequate consideration" and the insurer is the employer or a wholly owned (direct or indirect) subsidiary of the employer maintaining the plan. The Plan's investment in the Stable Fund easily falls within the scope of that exemption in that the Stable Fund is offered by an insurer, TFLIC, through a group annuity contract that entitles participants to benefits in the form of regular annuity payments. An annuity is "a sum paid yearly or at other specified intervals in return for the payment of a fixed sum by the annuitant." *Manne v. Commissioner of Internal Revenue*, 155 F.2d 304, 306 (8th Cir. 1946) (quoting *Bodine v. Commissioner of Internal Revenue*, 103 F.2d 982, 984 (3d Cir. 1939)). Black's Law Dictionary

*(footnote continued on next page)*

invested in TFLIC general account stable value products pay (through reductions in declared crediting rates) the very same investment management fees and capital charges that the Plan pays. In addition, external clients' declared crediting rates are further reduced to reflect a "spread" or profit element that the Plan does not pay; that is, the Plan's declared crediting rates are not reduced to reflect the "spread" profit that TFLIC targets on external clients' investments. (Ex. 41 at ¶ 7.) It follows that the Plan pays "no more than adequate consideration" for this TFLIC annuity product, since external investors in TFLIC general account stable value products are paying the same consideration and more. (Ex. 41 at ¶¶ 6–7.) *See* 29 U.S.C. § 1002(18)(B) (defining "adequate consideration" as "the fair market value of the asset"); *Dupree v. Prudential Ins. Co. of America*, No. 99-8337, 2007 U.S. Dist. LEXIS 57857, at *129 (S.D. Fla. Aug. 7, 2007) ("ERISA § 408(b)(5) expressly contemplates the payment of market-based fees to an insurer sponsoring a plan.")

 The remaining requirements of ERISA § 408(b)(5) are also satisfied. TFLIC is qualified to do business as an insurer (here, in New York), and is a wholly owned subsidiary of AEGON USA, LLC, the employer maintaining the Plan, as § 408(b)(5) also requires. (*See* Ex. 15 at 557.) Lastly, the total "premiums and annuity considerations" received from the Plan, even defined broadly as total annual deposits in the Stable Fund, were far less than 5% of TFLIC's total annual premiums "on all lines of insurance" for each year back through at least 2009.[11]

---

defines an annuity as, *inter alia*, "A savings account with an insurance company or investment company, usu. established for retirement income. Payments into the account accumulate tax-free, and the account is taxed only when the annuitant withdraws money in retirement." Black's Law Dictionary (10th ed. 2014).

[11] For example, in 2013, the Plan's Stable Fund received $15,259,418 in deposits (Ex. 7, 2013 Plan Form 5500, at 286), which are analogous to gross premiums for an annuity investment. Yet TFLIC received $5,246,669,725 in total premiums, including whole life premiums, GAC deposits and other annuity investments in 2013. (Ex. 42, Declaration of Chad Noehren, at ¶¶ 3–4.) In other words, the Plan's Stable Fund accounted for less than a third of a percent of TFLIC's premiums. Including the Plan's separate account balances on the theory that they are variable annuities does not push the Plan beyond this 5% threshold, as the Plan's separate account deposits are still substantially less than 5% of TFLIC's total premiums in any given year. (*See, e.g.*, Ex. 12, Plan Annual Statement for 2013 at 367.)

(*Compare* Exs. 8–13 (deposits into the Plan's GAC) *with* Ex. 42 at ¶¶ 3–4 (total deposits and other premiums across TFLIC's lines of business).)

### B. Plaintiffs Had Actual Knowledge That Their Investments Were Affiliated With AEGON Long Before February 6, 2012, and So Their Prohibited Transaction Claims are Barred by ERISA's Limitations Period.

Section 413 of ERISA provides that no action may be brought "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation . . . ." 29 U.S.C. § 1113. For prohibited transaction claims, "knowledge of the transaction" constitutes actual knowledge, sufficient to trigger ERISA's three-year limitations period. *Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856, 859 (8th Cir. 1999); *see also Krueger v. Ameriprise Fin., Inc.*, No. 11-cv-02781, 2014 U.S. Dist. LEXIS 36435, at *17–18 (D. Minn. Mar. 20, 2014) ("according to the Eighth Circuit, when a prohibited transaction claim is alleged under § 1106, knowledge of the transaction constitutes actual knowledge of the violation and starts the running of the limitations period.").

Plaintiffs have participated in the Plan at least since the start of 2009. (Exs. 32–37, Plaintiffs' Account Statements for 2009.) Plaintiffs allege in Count II of their Second Amended Complaint that AEGON and its affiliates engaged in prohibited transactions in violation of ERISA § 406, 29 U.S.C. § 1106, "each time they withdrew management fees from Proprietary Funds." (SAC at ¶ 71.) ERISA § 413(2) , 29 U.S.C. § 1113(2) imposes a three-year limitations period on such claims. The three-year period commences on "the earliest date on which the plaintiff had actual knowledge of the breach or violation."[12] The Eighth Circuit Court of Appeals, like the majority of other courts interpreting this statute, has construed the "actual

---

[12] ERISA § 413(2), 29 U.S.C. § 1113, provides, in relevant part: "No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligations under this part, or with respect to a violation of this part, after the earlier of (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation . . . ."

knowledge" requirement to mean knowledge of the relevant or material facts constituting the alleged violation, regardless of when or whether plaintiff actually realized those facts constituted a breach or gave rise to a claim. *Brown v. Am. Life Holdings, Inc.*, 190 F.3d at 859 (opining that with regard to prohibited transactions claims, "knowledge of the transaction would be actual knowledge of the breach"); *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1177 (3d Cir. 1992) ("actual knowledge of a breach or violation requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists" (internal quotations and citations omitted)); *Figas v. Wells Fargo & Co.*, No. 08-4546, 2010 U.S. Dist. LEXIS 79965, at *8 (D. Minn. Apr. 6, 2010) ("[Plaintiff] admits that she knew about those investments and, further, that she knew that investment management fees were paid as a result of these investments. There can be no doubt that [plaintiff] had 'actual knowledge of the breach' . . . "). In other words, once plaintiffs knew that the Plan's separate accounts and collective trusts were affiliated and fee-bearing, the three-year limitations period started running.

Courts have repeatedly held that the distribution of plan materials such as plan documents, prospectuses, and periodic reports establishes "actual knowledge" of the documents' contents for purposes of § 1113(2). *Brown v. Owens Corning Inv. Review Comm.*, 622 F.3d 564 (6th Cir. 2010) ("Actual knowledge [under 29 U.S.C. § 1113(2)] does not require proof that the individual plaintiffs actually saw or read the documents that disclosed the allegedly harmful investments.") (internal quotations and citations omitted); *Shirk v. Fifth Third Bancorp*, No. 05-cv-049, 2009 U.S. Dist. LEXIS 90775, at *11 (S.D. Ohio Sept. 30, 2009) ("In making this 'actual knowledge' determination, courts have 'focused on whether documents provided to plan participants sufficiently disclosed the alleged breach of fiduciary duty, not whether the individual plaintiffs actually saw or read the documents.'"). Accordingly, there is no genuine dispute here that plaintiffs had knowledge of the relevant facts constituting the alleged violation—the affiliated status of the investments they challenge and their attendant fees—prior to February 6, 2012. Plaintiffs received quarterly Investment Fact Sheets, which disclosed that the relevant Plan funds were affiliated. (*See, e.g.*, Ex. 24.) The fact sheets also disclosed the fees collected

15

from those investments. *Id*. And the Investment Fact Sheets disclosed the precise structure of the separate accounts and collective trust investments that plaintiffs challenge, including that the TFLIC funds invested in underlying TAM portfolios, which were themselves affiliated. *Id.*[13] Meanwhile, the Summary Plan Description disclosed that some investment options were offered by AEGON affiliates Diversified Investment Advisors, Inc. ("DIA") and Transamerica Retirement Solutions Corporation ("TRSC"). (Ex. 5, 2006 Summary Plan Description, at 215; Ex. 6, 2014 Summary Plan Description, at 249). These materials were sufficient to inform plaintiffs of the factual basis for their prohibited transaction claim prior to February 6, 2012, and plaintiffs' claims are thus barred by ERISA's three-year statute of limitations.

That plaintiffs have separately invoked ERISA § 406(b)(3), 29 U.S.C. §1106(b)(3), which they contend prohibits TAM, TFLIC and MFTC from receiving "consideration" from affiliated investment products, does not allow plaintiffs to escape the three-year time bar. The purported breaches "all were of the same character," and "[o]nce a plaintiff knew of one breach, an awareness of later breaches would impart nothing materially new." *Phillips v. Alaska Hotel and Restaurant Employees Pension Fund*, 944 F.2d 509, 520 (9th Cir. 1991). Plaintiffs' theory that each instance of a fee payment should be considered a separate breach causing the limitations period to begin anew would "essentially read[] the 'actual knowledge' standard out of [Section 1113(2) ]". *Id.* at 520.[14]

---

[13] *See, e.g.*, Ex. 24 at 1768 ("Transamerica Asset Management, Inc., an affiliate of Diversified, serves as the investment manager to each Core Fund and has the ability to appoint SubAdvisors."); *id.* at 1771 ("The Fund is offered through Diversified Investment Advisors Collective Trust. Massachusetts Fidelity Trust Company, an affiliate of Diversified, serves as Trustee."); *id.* at 1763 ("The Short Horizon Asset Allocation Fund is offered as a separate account through a group variable annuity contract issued by Transamerica Financial Life Insurance Company . . . The underlying investments of the Fund are the commingled accounts of a Transamerica Financial Life Insurance Company group annuity contract.").

[14] While the Real Estate fund was added to the Plan's lineup after February 6, 2012 (the option became effective on September 14, 2012), no named plaintiff has held an investment in that option through his or her account (Exs. 32–37), and the SAC does not allege otherwise (SAC at ¶¶ 13–18).

**C.** **ERISA's Six-Year Statute of Repose Precludes All ERISA § 406(b)(1) Claims for Which Plaintiffs Have Standing, Because the Funds at Issue Were Added to the Plan More Than Six Years Before the Commencement of This Suit.**

Plaintiffs further allege that the Plan engaged in a prohibited transaction under ERISA § 406(b) "[e]ach time the Plan paid fees to an AEGON-affiliated fund manager." (SAC at ¶ 7.) To the extent that this claim is based on ERISA § 406(b)(1), which prohibits a plan fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account," plaintiffs' claims are barred under ERISA's six-year statute of repose, which bars any action brought six years "after . . . the date of the last action which constituted a part of the breach or violation." ERISA § 413(1), 29 U.S.C. § 1113(1); *see also Radford v. Gen. Dynamics Corp.*, 151 F.3d 396, 400 (5th Cir. 1998) ("As a statute of repose, § 413 serves as an absolute barrier to an untimely suit.").

Multiple courts have held, in applying ERISA § 413, that a prohibited transaction occurs when a plan makes the initial decision to select a fund as an investment option, and that the mere fact that fee collection under the transaction continues thereafter does not toll the statute of repose. *David v. Alphin*, 704 F.3d 327, 341 (4th Cir. 2013) (finding that "[t]he only action that can support an alleged prohibited transaction is the ***initial*** selection of the affiliated funds" where plaintiffs claimed that a prohibited transaction occurred at every plan committee meeting where affiliated funds remained on fund line-up) (emphasis added); *see also Tibble v. Edison Int'l*, 711 F.3d 1061, 1068 (9th Cir. 2013) (rejecting "continuing violation" theory and finding that prohibited transaction occurred when the initial investment was made for purposes of ERISA's six-year statute of limitations), *vacated and remanded on other grounds by Tibble v. Edison Int'l*, __U.S. __, 135 S. Ct. 1823 (2015); *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1101 (9th Cir. 2004) ("The decision by [defendants] to ***continue*** to hold 15% of Plan assets in [the offending investment option] was not a 'transaction.'") (emphasis in original). In other words, once the affiliated funds at issue here were added to the Plan, any fees subsequently collected by affiliated entities pursuant to the terms of the initial transaction to include the funds should be considered not the direct result of defendants' actions, but of individual participants' decisions to

17

contribute to the Plan and allocate their accounts to the affiliated funds.[15]  It is indisputable that all affiliated investments in the Plan in which the named plaintiffs invested were included in the Plan's investment lineup more than six years prior to the commencement of this suit, or prior to February 6, 2009.  (Ex. 40 at ¶ 9; *see also* Ex. 5 at 222–24.)  Plaintiffs' claims are thus barred under ERISA's six-year statute of repose.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court enter judgment for defendants on Count II of the SAC pursuant to Fed. R. Civ. P. 56.  Defendants also respectfully request that the Court set oral argument, given the size of the record and because this motion is dispositive of plaintiffs' prohibited transactions claims.

//

//

//

//

//

//

//

//

//

//

---

[15] The Supreme Court's recent decision in *Tibble v. Edison Int'l*, __U.S. __, 135 S. Ct. 1823 (2015) regarding the operation of 29 U.S.C. § 1113 is inapposite here.  The Court's holding that a plan fiduciary has a continuing duty to monitor plan investments after the initial selection decision, 135 S.Ct. at 1829, makes sense with regard to monitoring plan fees—the issue in *Tibble*—given that the reasonableness of such fees will be subject to change over time.  In this context, however, imposing a continuing duty to monitor whether affiliated investments remain affiliated would be nonsensical and would vitiate 29 U.S.C. § 1113.  Moreover, to "deal with the assets of the plan in his own interest or for his own account" requires affirmative conduct, *see* 29 U.S.C. § 1106(b)(1), unlike a breach of the duty to monitor, which can be caused by inaction.

Dated:  November 23, 2015

By:    /s/ Wilford H. Stone
Wilford H. Stone
LYNCH DALLAS, P.C.
526 Second Avenue SE
Cedar Rapids, Iowa  52401
Telephone:   (319) 365-9101
Facsimile:    (319) 365-9512
E-mail:  wstone@lynchdallas.com

By:    /s/ Brian D. Boyle
Brian D. Boyle (*Pro Hac Vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006-4001
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414
Email:  bboyle@omm.com

Catalina J. Vergara (*Pro Hac Vice*)
Christopher Craig (*Pro Hac Vice*)
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, California  90071
Telephone:  (213) 430-6000
Facsimile:  (213) 430-6407
E-mail:  cvergara@omm.com
E-mail:  christophercraig@omm.com

*Attorneys for Defendants*

19